**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 27 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ROBERT EMERSON WHITE,

      Defendant - Appellant.

No. 00-2318

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-97-293-JC)**

---

Judith A. Rosenstein, Assistant Federal Public Defender (Scott M. Davidson, Research & Writing Specialist of New Mexico, with her on the briefs), Albuquerque, New Mexico, for Defendant - Appellant.

David N. Williams, Assistant United States Attorney (Norman C. Bay, United States Attorney, District of New Mexico, with him on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

---

Before **SEYMOUR**, **PORFILIO**, and **KELLY**, Circuit Judges.

---

**PORFILIO**, Senior Circuit Judge.

---

After conviction of the offense of receiving child pornography and a second violation of a special condition of his supervised release, Robert Emerson White was sentenced to six months in the custody of the Bureau of Prisons followed by a two-year term of supervised release. Having served the custodial sentence, Mr. White now challenges three of the five special conditions imposed: prohibition of Internet access, physiological testing, and probationary searches, contending not one is reasonably related to protecting the public or achieving his rehabilitation, and all infringe his First, Fourth, and Fourteenth Amendment rights. Exercising our appellate jurisdiction, 28 U.S.C. § 1291, we affirm the trial court's imposition of probationary searches but remand for the court's clarification of the scope of the denial of Internet access and the imposition of physiological testing.

**I.**

In 1996, Mr. White, using the e-mail address Lech23@AOL.COM, responded to an advertisement on the Internet for videos of young girls engaged in fondling and sexual intercourse with adult men. After Mr. White selected the mode of delivery and was assured the seller was not involved in a sting operation, he ordered three tapes. Despite his caution, United States Customs officers, who had placed the ad, made the controlled delivery, triggering his arrest and the execution of a search warrant which permitted the seizure of the tapes.

Subsequently, a federal grand jury charged Mr. White with receipt of child pornography in violation of 18 U.S.C. §§ 2252(a)(2)(A), 2256(1)(2)(A), and 2256(1)(2)(E). After negotiations, Mr. White pled guilty to an information charging him with receipt of child pornography, attended by a twenty-four-month term of incarceration and three-years of supervised release. The week after completing his custodial sentence, Mr. White consumed alcohol in violation of a special condition of his supervised release. The court reimposed a three-year term of supervised release but added another special condition. Soon after, Mr. White was again discovered drinking alcohol, and the government filed a second petition to revoke his supervised release, the basis of this appeal.

In that sentencing hearing, the district court accepted Mr. White's admission he consumed alcohol and heard arguments on two of the objections raised here, Internet access and probationary searches. The court then sentenced Mr. White to six months in custody followed by two years of supervised release with five special conditions.[1] These are that Mr. White shall: (1) not consume alcohol; (2) participate in a mental health program for sex offenders, which may include physiological testing approved by the United States Probation Office (USPO); (3) shall not possess erotica, or any other sexually explicit material, and shall not possess a computer with Internet access

---

[1]The court's order also contained thirteen standard conditions of supervised release which do not figure in this appeal.

throughout his period of supervised release; (4) submit to a search of his home, automobile, or person under direction of the USPO; and (5) not possess firearms, explosives, or other dangerous weapons.

Mr. White predicates his challenge to conditions 3, 4, and 5 solely on the facts underlying his present conviction of the single charge of receiving child pornography. In contrast, the government casts that conviction against a decade of conduct it believes demonstrates a history of sexual deviance. In 1986, it offers, Mr. White was convicted of vagrancy/annoying a child under eighteen in San Diego County, California, when he lifted an eight-year old's dress and attempted to remove her pants. As a condition of his parole, Mr. White had to register as a sex offender under California law. When he was later convicted of driving under the influence in 1992, he volunteered that he had been driving around asking where he could find young girls. The following year, Mr. White was convicted of possession of child pornography in Glendale, California, and as a condition of parole, was ordered not to have contact with children under fourteen years old. The government also apprized the sentencing court that while serving the first period of supervised release in this case, it received an affidavit sworn to by a woman who stated Mr. White invited her son to his room to use his computer. In each instance, the consumption of alcohol apparently was the catalyst for the aberrant behavior, it noted.

The government offers this extended history to provide context to the district court's exercise of discretion under 18 U.S.C. § 3583(a) in imposing a term of supervised

release and in balancing the factors mandated for consideration by 18 U.S.C. § 3553(a). Nonetheless, it characterizes the three issues raised as hypothetical and speculative. Because, so far, no searches have occurred, physiological testing ordered, or Internet access denied, the government contends the issues are not ripe for our consideration. Mr. White counters the conditions of supervised release incorporated in a final judgment of sentence are presently in effect in violation of his First, Fourth, and Fourteenth Amendment rights.

## II.

While the question of prudential ripeness frequently surfaces in civil cases, often those involving the interpretation of administrative rules, *see, e.g.,* ***Utah v. United States Dep't of the Interior***, 210 F.3d 1193 (10th Cir. 2000); ***Park Lake Res. Ltd. Liab. Co. v. United States Dep't of Agriculture***, 197 F.3d 448 (10th Cir. 1999), rarely are criminal cases subject to clearing this hurdle. However, because a ripeness concern challenges our very power to resolve the case, we must be convinced the questions presented satisfy the several ramifications of our "case or controversy" jurisdiction. To do so, even in the context of a criminal case, we borrow from the analysis set forth in ***Abbott Laboratories v. Gardner***, 387 U.S. 136 (1967), and the recent application of the rationale in a similar context. ***United States v. Loy***, 237 F.3d 251 (3d Cir. 2001).

Broadly, ***Abbott Laboratories*** cautions against the courts "entangling themselves in abstract disagreements" until the effects of a final order are "felt in a concrete way by

the challenging part[y]." 387 U.S. at 148-49. To assure a live "case or controversy,"

*Abbott* instructs courts to assess "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id*. at 149. This directive guided the Third Circuit when it addressed the government's effort to forestall review of two special conditions of supervised release raised in *Loy*. There, the court characterized the issue squarely as a matter of prudential ripeness.[2] 237 F.3d at 257. Its analysis is appropriate here.

In *Loy*, defendant was convicted of receiving and possessing child pornography and, while serving his thirty-three month sentence, appealed the imposition of two special conditions of his supervised release. One condition prohibited him from possessing "all forms of pornography, including legal adult pornography," and the second from "unsupervised contact with minor children . . . [and] the requisite supervision must come from someone other than his wife." *Id.* at 253. Loy claimed the former was vague and overbroad, and the latter vague and unsupported by the record. The government

---

[2]The court specifically defined this perspective to set the case apart from Third Circuit precedent which held that defendant's appeal of a condition of supervised release filed immediately after sentence was imposed satisfied Article III's ripeness doctrine. Those cases, **United States v. Ofchinick**, 937 F.2d 892 (3d Cir. 1991), and **United States v. Stine**, 646 F.2d 839 (3d Cir. 1981), instead, addressed the issue of ripeness solely in relation to waiver and not as a matter of prudential concern. In contrast, *Loy*'s focus was the court's power to address the issue. **United States v. Loy**, 237 F.3d 251, 257 (3d Cir. 2001).

countered the issues were not ripe for review; it had neither attempted to enforce either condition nor had there been a violation.

Applying *Abbott*'s prudential directive to look first at the hardship to the parties in withholding court consideration and then at the fitness of the issues raised for judicial review, the Third Circuit agreed Loy established hardship given that he could only learn of the prohibition's reach when he faced a revocation proceeding.[3]  Second, it determined the issue raised was fit for judicial review, the breadth of the prohibition presenting a question of law for which prompt resolution would inform Loy's conduct.  "The government's approach would have Loy discover the meaning of his supervised release condition only under continual threat of reimprisonment, in sequential hearings before the court.  Such an exercise is not necessary nor will it clarify the issues."  *Id.* at 258.

Further, the Third Circuit's analysis fulfilled *Abbott*'s teaching to examine "congressional intent . . . [as] an important component of the prudential ripeness inquiry." *Id.* (citing 387 U.S. at 139-40).  It ascertained the "legislative history of the Sentencing Reform Act of 1984 evidences Congress's intention that direct appellate review be the preferred method of reviewing a district court's sentence."  *Id.* (supporting statements found in S. Rep. No. 98-225, at 151 (1984), *reprinted* in 1984 U.S.C.C.A.N. 3182, 3334).

---

[3]Loy questioned whether his possession of an art book containing paintings of nudes might violate the ban.  In addressing the question on the merits, the Third Circuit observed, "Courts have long grappled with the problem of generating definitions to facilitate the regulation of sexually explicit materials."  237 F.3d at 262.

In the Third Circuit's view, the legislative history of the Guidelines certainly envisioned the role of appellate courts in the determination of the legality of sentences and any conditions of supervised release both at the time of their imposition and in an appeal from a revocation proceeding, the posture here. *Id.* In addition, such prompt review would promote judicial efficiency by eliminating the alternative of piecemeal appeals of parts of sentences. *Id.* at 261. Consequently, the court concluded the case was ripe for review having found:

> (1) we have "case or controversy" jurisdiction; (2) the issues are legal ones that we can easily resolve without reference to concrete facts; (3) defendant will experience a hardship if we do not resolve the issues; (4) the traditional canons that counsel against hearing these sorts of challenges are inapplicable in the context of supervised release conditions; and (5) the judicial system has an interest in dealing with this case as expeditiously as possible, instead of waiting for a distinct appeal of a conviction for a violation of the conditions of release.

*Id.* Thus, because the statute, 18 U.S.C. § 3583, makes supervised release a discretionary component of a final sentence, and it is "punishment," *United States v. Ginyard*, 215 F.3d 83, 87 (D.C. Cir. 2000), appellate courts have jurisdiction to consider the legality of its terms.

Each of these factors is equally present here. Indeed, the consequences for Mr. White are perhaps more serious, the case now before us after a revocation of supervised release hearing, which resulted in six months' reincarceration followed by a two-year term of supervised release with five special conditions attached. Violation now of any of these special conditions after this second revocation of supervised release petition would

more predictably foreclose his passageway from incarceration to the completion of his sentence. Consequently, he has established hardship. The issues he has raised are legal questions capable of judicial resolution. Finally, despite the government's assurance it would not later raise a waiver argument in a subsequent proceeding, our interest in judicial efficiency finds this assurance vacuous.

## III.

Because there is no applicable sentencing guideline for the sentence to be imposed after a violation of supervised release, the standard for review is "plainly unreasonable" under 18 U.S.C. § 3742(e)(4).[4] In reviewing the sentence and the court's explanation of it, "we will not reverse if it can be determined from the record to have been reasoned and reasonable." *United States v. Lee*, 957 F.2d 770, 774 (10th Cir.1992).

We are not without guidance, however. The Sentencing Guidelines, U.S.S.G. §§ 5D1.1, 5D1.2, 5D1.3, and its policy statements promulgated in U.S.S.G. ch. 7, which mirror the statutes, 18 U.S.C. §§ 3583(a) and 3553(a), and case law govern the goals of a term of supervised release and the validity of the conditions which may be attached. Although a sentencing "court enjoys broad discretion in setting a condition of supervised release," *United States v. Edgin*, 92 F.3d 1044,1047 (10th Cir. 1996) (citations omitted),

---

[4]18 U.S.C. § 3742(e)(4) states:
(e) Consideration. – Upon review of the record, the court of appeals shall determine whether the sentence –
    (4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.

18 U.S.C. § 3583(a),[5] that discretion is guided by the factors set forth in 18 U.S.C.

§ 3553(a) and enumerated in 18 U.S.C. § 3583(d).  To assure that a "court shall impose a

sentence sufficient, but not greater than necessary," the sentencing court must consider, in

part:

> **(1)**  the nature and circumstances of the offense and the history and characteristics of the defendant.
>
> **(2)**  the need for the sentence imposed –
>
>> **(A)**  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> **(B)**  to afford adequate deterrence to criminal conduct;
>>
>> **(C)**  to protect the public from further crimes of the defendant; and
>>
>> **(D)**  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . .

---

[5]18 U.S.C. § 3583(a) provides:

> **(a) In general** –
> The court, in imposing a sentence to a term of imprisonment for a felony or misdemeanor, may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment, except that the court shall include as a part of the sentence a requirement that the defendant be placed on a term of supervised release if such a term is required by statute or if the defendant has been convicted for the first time of a domestic violence crime as defined in section 3561(b).

18 U.S.C. § 3553(a). While the district court then *shall* consider "*a multitude of factors . . . when determining the appropriate sentence in* [revocation of supervised release], [n]o single factor necessarily predominates over any other, and the statutory language, 'The court . . . shall consider,' evidences that none of them, whenever applicable, should be ignored altogether." **United States v. Marvin**, 135 F.3d 1129, 1136 (7th Cir. 1998) (italics in original). Thus, a condition that is "reasonably related" to these factors, "involves no greater deprivation of liberty than is reasonably necessary," and is "consistent with pertinent policy statements" of the Sentencing Commission, 18 U.S.C. § 3583(d)(1), (2), (3), will surely be judged "reasoned and reasonable." **Lee**, 957 F.2d at 774.

## IV.

Mr. White contends each of the special conditions now challenged fails to satisfy these criteria. The factual predicate for purposes of § 3553(a), he insists, is his plea to a single count of receiving child pornography which he ordered over the Internet. That predicate is not "reasonably related" to prohibiting him from all access to the Internet, he urges, and thus the special condition is "greater than necessary" in the equation balancing protection of the public with the goals of sentencing. He contends he is presently writing a book, and the prohibition of any access to the Internet, an essential tool for his research, defeats any rehabilitative goals of his sentence, is not reasonably related to protecting the public, and unnecessarily infringes his First Amendment rights. He suggests the court

could have tailored the condition to prohibit his visiting child pornography chatrooms and sites or to permit probation officers to examine his computer files to verify the sites he has used.

The government counters the special condition reasonably relates to the offense of conviction and the "history and characteristics of the defendant," § 3552(a)(1), referencing the ten-year span of defendant's sex offenses. It relies on *United States v. Crandon*, 173 F.3d 122 (3d Cir. 1999), in which the Third Circuit upheld a special condition of supervised release which specified defendant not "possess, procure, purchase or otherwise obtain access to any form of computer network, bulletin board, Internet or exchange format involving computers unless specifically approved by the United States Probation Office." *Id.* at 125.

*Crandon* differs on its facts, however. In that case, defendant, age thirty-nine, developed a relationship with a fourteen-year-old girl over the Internet and eventually traveled from his home in New Jersey to her home in Minnesota, had sexual relations with her, and photographed her nude. His use of the Internet clearly initiated and facilitated a pattern of criminal conduct and victimization that produced an immediate consequence and directly injured the victim. Nonetheless, the sentencing court did not deny defendant all access to the Internet. Instead, it barred defendant from obtaining "access to a computer network, bulletin board . . . unless specifically approved by the

United States Probation Office." ***Id.*** The special condition is narrower in some respects and broader in others than that present here.

In the case before us, the district court ordered Mr. White "shall not possess a computer with Internet access throughout his period of supervised release." As worded, the prohibition does not bar Mr. White's access to the Internet; only his possession of a computer with Internet access.[6] The distinction is not without a difference. Despite the apparent constraint, Mr. White may visit a library, cybercafe, even an airport, and log onto the Internet. The Internet is also accessible *via* web-t.v. by attaching an electronic device to a television. Consequently, if the district court targeted this special condition at the nature and circumstances of the offense and Mr. White's history and characteristics to prevent using the Internet to order child pornography, it missed the mark.[7]

Even if we were to read the two clauses of the special condition together, "shall not possess erotica . . . and shall not possess a computer with Internet access," inferentially linking the possession of the computer with the means of possessing erotica, Mr. White could still conform his conduct to the technical meaning of the condition while circumventing it. Consequently, if the court endeavored to deny Mr. White access to

---

[6]In this respect, Mr. White's contention the special condition is a "blanket prohibition" also misinterprets the wording but underscores the inherent confusion in its meaning.

[7]Although Mr. White may still technically possess a computer for word processing and record keeping, most computers now are equipped with an internal modem, rendering any use of the computer a possible access to the Internet. Without more, does his mere possession of such a computer equate to violating the special condition?

Internet sites that feature child pornography, erotica, and sexually explicit material, the source of possession, the special condition again overshoots the mark. As noted, Mr. White can presently access chatrooms, bulletin/message boards, game rooms, video and/or audio streaming, or send and receive e-mail simply by logging onto the Internet on a computer at another location.

However, if the district court intended to deny Mr. White any access whatsoever to the Internet by having the word "possess" incorporate the concept of use, the special condition overreaches. That reading would bar Mr. White from using a computer at a library to do any research, get a weather forecast, or read a newspaper online. Under these circumstances, the special condition is "greater than necessary," 18 U.S.C. § 3553(a), and fails to balance the competing interests the sentencing court must consider.

Consequently, because the special condition is at the same time potentially too narrow and overly broad, we must remand for the district court to articulate its contours not simply to comport with the statutory guidelines of supervised release but particularly to reflect the realities of the Internet and its rapidly changing technology. Although Mr. White also insists the prohibition violates his First Amendment rights, we do not reach this question. As discussed, the meaning of the condition itself makes it susceptible to remand, not its constitutionality. We offer some suggestions for that task.

To limit Mr. White's use of the Internet to obtain child pornography or other sexually explicit material, filtering software is available to interpose a barrier between the

computer's web browser and Internet connection.[8]  These programs filter objectionable

material either by blacklisting sites and removing them from access, or by whitelisting the

sites, blocking access to all sites except those listed on the 'white' list based on categories

of content.  *See* Thomas B. Nachbar, *Paradox and Structure: Relying on Government*

*Regulation to Preserve the Internet's Unregulated Character*, 85 Minn. L. Rev. 215, 224

(2000).  Of course, the software regulates content only on the computer in which it is

installed,[9] and none of the software presently available is completely effective.  In fact, no

approach is without its peculiar shortfall, and all depend on continual updating, a

daunting task given the rapid proliferation of Internet communication.  More sobering,

software is presently available to erase from a computer's hard drive the names of sites

---

[8]In general, "Internet content filtering is accomplished by using a piece of software to compare information about a piece of content with a set of filtering criteria before displaying the content on the user's computer monitor.  This technology is known as 'filtering' or 'filters' because the browser lets only certain content 'through' the filter to the person viewing the content.  Content that does not meet the criteria is screened by the filter before it reaches the user."  Thomas B. Nachbar, *Paradox and Structure: Relying on Government Regulation to Preserve the Internet's Unregulated Character*, 85 Minn. L. Rev. 215, 223 (2000).  This filtering software was originally designed to restrict children and teenagers from accessing X-rated materials, hate groups, and other objectionable subjects that parents discovered were readily available.  Net Nanny, Internet Guard Dog, Cyber Patrol, Cybersitter 2000, and other filtering software block such material either by blacklisting, whitelisting, site labeling or other content-examination.  However, no program is completely effective.  *See* Consumer Reports Online (Mar. 2001), *available at* http://www.consumerreports.org/Special/ConsumerInterest/Reports/0103fil0.html.

[9]For example, because a filter is installed on a particular computer and requires a password to log on, Net Nanny may be circumvented by using a computer in a different location.

visited.  A sophisticated Internet user can circumvent any barrier with knowledge of programming.

Given the openness of cyberspace, if the court instead chooses to prohibit Mr. White's using any computer, we must caution against this broad sweep under the facts and circumstances here.  The communication facilitated by this technology may be likened to that of the telephone.  Its instant link to information is akin to opening a book.  Indeed, cyberspace defies boundaries; it offers unlimited access.  "[T]he openness of this architecture means this: That there is no 'natural' or simple or 'automatic' way to keep people out because there are no natural or real borders that close off access to those who should not have access."  Lawrence Lessig, *Reading the Constitution in Cyberspace*, 45 Emory Law J. 869, 887 (1996).[10]

Consequently, any condition limiting Mr. White's use of a computer or access to the Internet must reflect these realities and permit reasonable monitoring by a probation officer.  The purpose of the special condition must be articulated and enforceable as defined.   As presently written, the special condition is neither reasoned nor reasonable.  We, therefore, remand the special condition prohibiting possession of a computer with

---

[10]Professor Lessig likens cyberspace to "digital cash."  Lawrence Lessig, *Reading the Constitution in Cyberspace*, 45 Emory Law J. 869, 877 (1996).  "There was a time when we relied upon another tool of anonymity . . . cash.  Cash is an almost perfect tool of anonymity.  Nothing in its nature reveals anything about the person using it; it is self-authenticating . . . One could use cash, and unless identification were independently given, the identity of the one who used the cash would be lost to the system.  Cash flows without a trace."

access to the Internet for the district court to specify its meaning.

**V.**

The special condition including the possibility of "physiological testing approved by a United States Probation Officer," raises another concern.[11] The parties agree that during sentencing, the district court stated, "the defendant must participate in a mental health program for sex offenders that may include *psychological* testing approved by the probation office." (italics added). The written order, however, states the mental health program for sex offenders "may include *physiological* testing" approved by probation (italics added). Nonetheless, at oral argument and in their briefs, the parties explained the district court meant to say *physiological* testing but misspoke although neither side attempted to contact the district court to verify this interpretation.

Again, the distinction is not without a difference. During the sentencing hearing, counsel for Mr. White insisted the record established he suffered from "an illness, which is alcoholism," and Mr. White told the court when something caused a problem, he sought "solace in the bottle." The government acknowledged Mr. White's drinking triggered his aberrant sexual behavior.

Given the ambiguity in the record, we must remand this portion of the sentence, as well, for the district court to clarify the type of testing it ordered to accompany the mental

---

[11]Although Mr. White did not object to this condition during sentencing, our present disposition does not trigger the question of whether we apply plain error review.

health program for sex offenders.[12]  Although the government argued tests have not yet been and may never be given, the terms of supervised release are not tied to contingencies but to their reasonable relation to the factors enumerated in § 3553(a).  We therefore remand this special condition of physiological testing for the district court to specify its role and relationship to the mental health component.

## VI.

Finally, Mr. White contends the "unwarranted and suspicionless" searches ordered as a condition of his supervised release unnecessarily deprive him of his Fourth Amendment rights.  Because the special condition did not require a probation officer to have a reasonable belief Mr. White had violated the terms of his supervised release before the invasion of privacy, he urges the condition is greater than necessary to achieve the goals of § 3553(a).  The government counters that probationary searches ordered for an individual who has possessed and attempted to conceal child pornography advance the goals of protecting the public and rehabilitating the defendant.

Rejecting counsel's broad constitutional objection, the district court specified, "It's not a matter of searching anybody, it's a matter of searching someone who has been convicted of a serious offense, who has violated conditions of supervised release.  The

---

[12]Although the government assured the panel the physiological testing envisioned included blood tests, urinalyses, polygraphs, and EKG's, other, highly intrusive physiological testing is available, as Mr. White noted, including electrodes placed on the skull to record physical responses to sexual stimuli and penile plethysmograph tests.

point is to try to make sure that there is [sic] no additional victims while a person is serving the remainder of supervised release." Clearly, the district court considered "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). As such, the searches fall within the "special needs" exception the Court sanctioned in *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). Key to the exception here is for the probation officer to "be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character and circumstances." *Id.* at 879.

Probationary searches are not uncommon. *See United States v. Germosen*, 139 F.3d 120, 131 (2d Cir. 1998) (defendant's lack of candor and trustworthiness warranted searches of his property during his supervised release); *United States v. Chinske*, 978 F.2d 557, 559 (9th Cir. 1992) (years of growing and selling marijuana with the knowledge of the illegality of the operation rendered special condition reasonably related to the offense). Despite the span of years between Mr. White's prior conviction for inappropriate behavior with a child, the record of his present conviction underlying two violations of supervised release for drinking alcohol, counsels the reasonableness of this special condition. Because supervised release remains a passageway between freedom and the loss of freedom, probationary searches serve to assure defendant is fully aware of his status in this transition. With the recognition "[t]he violation of a condition of supervised release is not a crime, but it is a 'breach of trust,' and a ground for revocation

of supervised release," ***United States v. Marvin***, 135 F.3d at 1137 (quoting ***United States v. Hill***, 48 F.3d 228, 232 (7th Cir. 1995)), we conclude this special condition is not plainly unreasonable.

We therefore **AFFIRM** the inclusion of probationary searches in the sentence. We **REMAND** the other two special conditions for further specification consistent with this order.