FILED
United States Court of Appeals
Tenth Circuit

May 10, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

BRIAN VON BEHREN,

       Defendant - Appellant.

No. 15-1033

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:04-CR-00341-REB-1)**

---

John T. Carlson, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

J. Bishop Grewell, Assistant U.S. Attorney (John F. Walsh, United States Attorney), Denver, Colorado, for Plaintiff-Appellee.

---

Before **BRISCOE**, **SEYMOUR**, and **LUCERO**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Brian Von Behren is serving a three-year term of supervised release stemming from a 2005 conviction for distribution of child pornography. One of the conditions of his supervised release was modified to require that he successfully complete a sex offender treatment program, including a sexual history polygraph requiring him to answer four questions regarding whether he had committed sexual crimes for which he was never charged. The treatment program required him to sign an agreement instructing the treatment provider to report any discovered sexual crimes to appropriate authorities. Mr. Von Behren contended that the polygraph condition violates his Fifth Amendment privilege against self-incrimination. The district court disagreed and held that the polygraph exam questions do not pose a danger of incrimination in the constitutional sense. Mr. Von Behren refused to answer the sexual history questions, thereby requiring the treatment provider to expel him from the program and subjecting him to potential revocation of his supervised release for violating the condition of supervision. The district court denied Mr. Von Behren's request to stay further proceedings pending appeal, but this court granted a stay. We reverse on the Fifth Amendment issue.[1]

---

[1] We have jurisdiction to review rulings on the post-judgment modification of supervised release, *United States v. Lonjose*, 663 F.3d 1292, 1299-1300 (10th Cir. 2011), and the issue raised is ripe for judicial review. *See United States v. Wayne*, 591 F.3d 1326, 1329 n.1 (10th Cir. 2010) (citing *United States v. White*, 244 F.3d 1199, 1202-04 (10th Cir. 2001)) (challenge to condition of supervised release ripe for review where legal issue is fit for judicial decision, defendant will

(continued...)

# I

## BACKGROUND

In March 2005, Mr. Von Behren was sentenced to 121 months in prison and three years of supervised release for receipt and distribution of child pornography. In March 2014, as he neared release, the probation office petitioned to modify his release conditions. The petition requested several new and revised conditions, among which was a requirement that Mr. Von Behren not only participate in but also successfully complete an approved sex offender treatment program. These new conditions were necessary for Mr. Von Behren to be accepted into a program that complied with standards mandated by the Colorado Sex Offender Management Board (SOMB).

Created in 1992, SOMB is a regulatory board tasked with developing and implementing statewide standards for the assessment, evaluation, treatment, and behavioral monitoring of adult sex offenders. *See* Colo. Rev. Stat. § 16-11.7-103(1), (4). Compliance with SOMB standards is imperative to the continued operation of Colorado sexual treatment providers. *See* Colo. Rev. Stat. § 16-11.7-106(1) (neither a state agency nor judicial department may contract with any non-certified treatment provider to provide sex offender treatment). One such standard is that each treatment program must conduct sexual history

---

[1](...continued)
experience hardship if we do not resolve issue, and prompt review will promote judicial efficiency).

polygraphs. SOMB Guidelines § 6.120. Failure to comply with SOMB standards

can lead to removal from the state's list of approved providers. *Id.* § 8.010; Colo.

Rev. Stat. § 16-11.7-106(7)(b)(I). Treatment providers thus have a large incentive

to ensure that every patient they treat complies with SOMB requirements. As a

result, certified providers will not accept an offender or allow the offender to

continue in treatment if the offender refuses to undergo the sexual history

polygraphs required by SOMB.

Mr. Von Behren was assigned to a SOMB certified treatment provider

named RSA, which stands for Redirecting Sexual Aggression. Due to SOMB

Guidelines requiring a written contract between the treatment provider and the sex

offender, SOMB Guidelines §§ 3.310, 3.410, RSA presented Mr. Von Behren with

a non-negotiable treatment agreement. The agreement required Mr. Von Behren

to complete a non-deceptive sexual history polygraph in order to advance through

the program. Failure to complete the sexual history polygraph would result in

removal from the program. Moreover, the agreement contained the following

provision concerning information gained by RSA regarding any crimes committed

by Mr. Von Behren:

> *I hereby instruct RSA, Inc. to report to any appropriate authority* or
> authorities *any occurrence or potential occurrence of any sexual offense on
> my part* regardless of how RSA, Inc. gains knowledge of such occurrence
> or potential occurrence. "Appropriate authority or authorities" as used in
> this and subsequent revisions may include, but is not limited to, County
> Human Services Departments, law enforcement agencies, probation or
> parole personnel, victims or potential victims, parents, spouses, school

-4-

personnel, and employers.

Rec., vol. 1 at 174 (emphasis added).

Mr. Von Behren objected to probation's supervised release modifications, claiming, among other things, that the requirement to complete a sexual history polygraph violated his Fifth Amendment right against self-incrimination. In its first order, on August 26, 2014, the district court addressed the RSA contract and held that because successful completion of sex offender treatment was a new condition of Mr. Von Behren's supervised release, and because compliance with the terms of the RSA agreement was required for participation in and successful completion of the RSA program, the requirements of the RSA agreement were, in effect, conditions of Mr. Von Behren's supervised release. The court ultimately sustained Mr. Von Behren's objection on the basis of the Fifth Amendment. Without knowing the exact questions Mr. Von Behren would be asked, the court modified Mr. Von Behren's release conditions to exclude any requirement that he admit to a criminal offense other than his offense of conviction.

A few months later, despite the district court's pronouncement, RSA informed Mr. Von Behren that he would need to submit to a sexual history polygraph or leave the program. RSA told Mr. Von Behren that the polygraph examination would include four mandatory questions:

1. After the age of 18, did you engage in sexual activity with anyone under the age of 15?
2. Have you had sexual contact with a family member or relative?

3. Have you ever physically forced or threatened anyone to engage in sexual contact with you?
4. Have you ever had sexual contact with someone who was physically asleep or unconscious?

*Id*. at 172. An affirmative answer to any one of the questions would trigger a mandatory follow-up question asking "how many" times? *Id*. at 172-73. Among these four questions, Mr. Von Behren would be permitted to refuse to answer one.

Due to RSA's apparent violation of the district court's initial order, Mr. Von Behren, on December 23, 2014, filed an emergency motion to block the exam. On January 27, 2015, upon seeing the particular questions that RSA would ask, the district court reconsidered its earlier decision, denied Mr. Von Behren's motion, and ordered him to complete RSA's sexual history polygraph. The court held that the mandatory questions "d[id] not present a real and appreciable risk of incrimination to Mr. Von Behren." *Id*. at 179. Specifically, the court noted that Mr. Von Behren's answers would not "specify the time, the place, the identity of any victim, or other people involved." *Id*. at 180. The court did not address compulsion, reasoning that "[a]bsent a risk of incrimination, it [was] not necessary to consider the issue of compulsion." *Id*. at 183.

Mr. Von Behren filed an immediate notice of appeal, as well as a written request asking the district court to stay its ruling. In the meantime, RSA informed Mr. Von Behren that his polygraph examination was scheduled for

February 11.  On February 4 in its response to Mr. Von Behren's motion for stay, the government stated that RSA would terminate Mr. Von Behren from treatment should he refuse to take the February 11 polygraph examination.  Gov't Response to Stay, Dist. Ct. Doc. 104, at 6 n.2.  The government also declared its opposition to any scenario whereby Mr. Von Behren would be permitted to stay in the community without treatment, and asserted that it would seek remand to prison if Mr. Von Behren did not receive sex-offender specific treatment.  *Id*. at 7.

The district court issued its order denying Mr. Von Behren's stay on the afternoon of February 10, less than twenty-four hours before the scheduled exam time.  Just before midnight on February 10, Mr. Von Behren filed a motion with this court asking us to stay the district court's order pending direct appeal.  The next day, while Mr. Von Behren was in the examiner's parking lot, we granted his emergency stay of the polygraph pending appeal.

# II

## THE FIFTH AMENDMENT PRIVILEGE
## AGAINST SELF-INCRIMINATION

Mr. Von Behren contends the district court erred when it held that one of his conditions of supervised release, a sexual polygraph examination with four mandatory questions, did not violate the Fifth Amendment's privilege against self-incrimination.  "Our review of matters of constitutional law is de novo."

*United States v. Rivas-Macias*, 537 F.3d 1271, 1276 (10th Cir. 2008). Accordingly, we will take a "'fresh, independent' look at the question at bar." *Id.* (quoting *Timmons v. White*, 314 F.3d 1229, 1234 (10th Cir. 2003)).

The Fifth Amendment to the United States Constitution states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V  The Fifth Amendment's privilege against self-incrimination applies not only to persons who refuse to testify against themselves at a criminal trial in which they are the defendant, "but also 'privileges [them] not to answer official questions put to [them] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [them] in future criminal proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).  Significantly, "[a] defendant does not lose this protection by reason of his conviction of a crime[.]" *Id*.

"To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177, 189 (2004) (citing *United States v. Hubbell*, 530 U.S. 27, 34-38 (2000)).  There is no doubt that answering questions during a polygraph examination involves a communicative act which is testimonial.  *See Schmerber v. California*, 384 U.S. 757, 761 (1966) (holding privilege protects only communicative acts).  But the elements of incrimination

-8-

and compulsion are less certain and, accordingly, are the focus of this case. We address each in turn.

## A. Incrimination

To assure an individual is not compelled to produce evidence that may later be used against him in a criminal action, the Supreme Court has always broadly construed the protection afforded by the Fifth Amendment privilege against self-incrimination. *Maness v. Meyers*, 419 U.S. 449, 461 (1975); *see also Hoffman v. United States*, 341 U.S. 479, 486 (1951); *Rivas-Macias*, 537 F.3d at 1278. Accordingly, "[t]he protection does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution." *Maness*, 419 U.S. at 461 (citing *Hoffman*, 341 U.S. at 486).

The Fifth Amendment privilege is only properly invoked when the danger of self-incrimination is "real and appreciable," as opposed to "imaginary and unsubstantial," *Brown v. Walker*, 161 U.S. 591, 599 (1896), and "this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman*, 341 U.S. at 486. But we have explained that "[n]ot much is required . . . to show an individual faces some authentic danger of self-incrimination, [] as the privilege 'extends to admissions that may only *tend* to incriminate.'" *Rivas-Macias*, 537 F.3d at 1278 (citation

-9-

omitted) (quoting *Emspak v. United States*, 349 U.S. 190, 197 (1955)). Accordingly, "we will uphold an individual's invocation of the privilege against self-incrimination unless it is 'perfectly clear, from a careful consideration of all the circumstances in the case,' that the witness 'is mistaken' and his answers could not 'possibly have' a 'tendency to incriminate.'" *Id.* at 1278-79 (quoting *Hoffman*, 341 U.S. at 488). Determining whether an individual has properly invoked the privilege "is a question of law, which we review de novo." *Id.* at 1278 (citing *United States v. Bautista*, 145 F.3d 1140, 1149 (10th Cir. 1998)).

In this case, the district court held that the mandatory questions, along with each of their follow-up questions, do not present a real and appreciable risk of incrimination. It was convinced that the questions would only produce general answers and would not require Mr. Von Behren to specify the time or location of any incident, the identity of any victims, or the names of other people involved, concluding that the four "questions present at worst, 'an extraordinary and barely possible contingency' of incrimination and prosecution." Rec., vol. 1 at 181 (quoting *Brown*, 161 U.S. at 599). We disagree.

We start with the questions. Three of RSA's mandatory questions ask for the admission of a felony: (1) "After the age of 18, did you engage in sexual activity with anyone under the age of 15?";[2] (2) "Have you ever physically forced

---

[2] *See*, *e.g.*, Colo. Rev. Stat. § 18-3-405(1).

-10-

or threatened anyone to engage in sexual contact with you?";[3] and (3) "Have you ever had sexual contact with someone who was physically asleep or unconscious?"[4]  The fourth mandatory question asks about sexual contact with a family member, which acts to limit the possible pool of victims.[5]  Given his reluctance to submit to the polygraph, we infer that Mr. Von Behren's answers to these questions would reveal past sex crimes.  *See*, *e.g.*, *United States v. Antelope*, 395 F.3d 1128, 1135 (9th Cir. 2005) ("Based on the nature of this [sexual polygraph] requirement and Antelope's steadfast refusal to comply, it seems only fair to infer that his sexual autobiography would, in fact, reveal past sex crimes.").

An affirmative answer to any one of these questions could not support a conviction on its own, but that is not the test.  The Fifth Amendment is triggered when a statement would provide a "lead" or "a link in the chain of evidence needed to prosecute the" speaker, *see*, *e.g.*, *United States v. Powe*, 591 F.2d 833, 845 n.36 (D.C. Cir. 1978), and affirmative answers to these questions would do just that.  If there were presently an investigation looking into the commission of a sex crime, and if Mr. Von Behren were a suspect, an affirmative answer to these

---

[3] *See*, *e.g.*, Colo. Rev. Stat. § 18-3-402(4)(a).

[4] *See*, *e.g.*, Colo. Rev. Stat. § 18-3-402(1)(h).

[5] This question could also involve the admission of a felony.  *See*, *e.g.*, Colo. Rev. Stat. § 18-6-301(1).  However, the Colorado incest law only attaches criminal liability to sexual relations between certain relatives, and the RSA question is not specific in its use of the term "family member" or "relative."

questions would allow the police to focus the investigation on him. Moreover, investigators would certainly look at Mr. Von Behren differently if they were made aware that he had physically forced someone to engage in sexual relations with him.

The government, relying on *Zicarelli v. New Jersey Commission of Investigation*, 406 U.S. 472, 478-79, 479 n.17 (1972), argues that when the answer to a question would present only a remote and speculative possibility of incrimination, and would therefore merely confirm the operating assumption of law enforcement, there is no new link in the chain of evidence. But when the witness in *Zicarelli* was subpoenaed to testify in front of the New Jersey Commission of Investigation concerning organized crime, he refused to answer any questions even after being provided immunity. *Id.* at 473-74. Despite the immunity, the witness claimed he feared foreign prosecution. *Id.* at 478-79. One of the questions he objected to asked him if he was a member of the Cosa Nostra. *Id.* at 479, n.17. The Court stated that an answer to that question would only confirm the assumptions of law enforcement. *Id.* Mr. Von Behren's case is far different. The witness in *Zicarelli* was a well-known member of organized crime, and the committee questioning him, with a grant of immunity, was simply asking him to confirm the fact. *Id.* at 473-74. Here, Mr. Von Behren is being asked to admit that he committed uncharged sexual crimes. There is no evidence the police have a working assumption that Mr. Von Behren committed such crimes

-12-

and, even if they did, they could not force a witness to admit to a general crime because it merely confirms what they "already know."

Furthermore, an affirmative answer could potentially be used against Mr. Von Behren if he were ever charged with a sex crime. For instance, if Mr. Von Behren were to answer yes to the underage sex question or the physical force question, those answers could be used against him to show he has a propensity to commit such bad acts. *See* Fed. R. Evid. 413, 414 (Rule 413(a) allows the introduction of character evidence in sexual assault cases to show a propensity toward committing such crimes, and Rule 414(a) allows the same thing in child molestation cases.). As we recognized in *United States v. Nance*, 767 F.3d 1037 (10th Cir. 2014), "[a]lthough '[t]he rules of evidence generally prohibit the admission of evidence for the purpose of showing a defendant's propensity to commit bad acts,' Rule 414(a) 'provides an exception to this general rule' by allowing the jury in a prosecution for child molestation to consider the fact that the defendant has committed other acts of child molestation as evidence that the defendant committed the charged offense." *Id.* at 1041 (quoting *United States v. Sturm*, 673 F.3d 1274, 1282 (10th Cir. 2012)).[6] And while the government argues that a trial court could exclude such evidence under Fed. R. Evid. 403, the evidentiary rule that commands trial courts to exclude relevant evidence if its

---

[6] Colorado does not have a corresponding state version of Rules 413 or 414 of the Federal Rules of Evidence.

probative value is substantially outweighed by its prejudicial effect, we do not think the Fifth Amendment privilege should be submitted to an evidentiary balancing test.

The district court based part of its conclusion on the fact that Mr. Von Behren's polygraph examiner does not act as a criminal investigator, but rather as a medical professional merely tasked with gathering relevant information to serve the goal of treatment. The court noted that Mr. Von Behren's scheduled polygrapher had conducted about 47,000 polygraphs since 1978 and had never been contacted by law enforcement regarding the results of a polygraph. This may be true, but "[o]nce the court determines that the answers requested would tend to incriminate the witness, it should not attempt to speculate whether the witness will in fact be prosecuted." *United States v. Jones*, 703 F.2d 473, 478 (10th Cir. 1983) (citing cases). The district court mistakenly assumed that an assurance from the government was a substitute for immunity. *See United States v. Bahr*, 730 F.3d 963, 966 n.2 (9th Cir. 2013) ("The privilege is concerned with threat of incrimination; it does not look to whether the government mercifully chooses not to capitalize on the constitutional violations it orchestrated.").

Notably, there is a provision in Mr. Von Behren's contract with RSA that instructs RSA "to report to any appropriate authority or authorities any occurrence or potential occurrence of any sexual offense." Rec., vol. 1 at 174. This provision, which specifically authorizes his examiner to report his

admissions to the police, undoubtedly adds to Mr. Von Behren's apprehension in regard to answering the four questions. Because the answers to the four mandatory questions could focus an investigation—otherwise ignorant of his past sex crimes—on Mr. Von Behren, and also because his confession to these past crimes could potentially be used against him at trial under Fed. R. Evid. 413 and 414, we conclude that Mr. Von Behren faces at least some authentic danger of self-incrimination by answering three of the four mandatory questions in the RSA's sexual history polygraph.

**B. Compulsion**

After concluding in its final order that RSA's sexual polygraph questions do not pose a real and appreciable risk of incrimination to Mr. Von Behren, the district court saw no need to consider whether there was compulsion. Having disagreed with the district court on the incrimination issue, we turn to the issue of compulsion.

"[T]he touchstone of the Fifth Amendment is compulsion . . . ." *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977). The privilege's prohibition against compulsion prevents the state from threatening to impose "substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Id.* at 805. This is so because "the privilege against compelled self-incrimination could not abide *any 'attempt, regardless of its ultimate effectiveness*, to coerce a waiver of the immunity it

-15-

confers.'" *Id.* at 805-06 (quoting *Gardner v. Broderick*, 392 U.S. 273, 279 (1968)) (emphasis added). Relying on *Cunningham*, the district court determined in its initial order finding a risk of incrimination, that the penalty of potential "revocation of supervised release and concomitant incarceration . . . is sufficiently severe to constitute compulsion." Rec., vol. 1 at 114. We agree with that conclusion.

The Fifth Amendment's text "does not prohibit all penalties levied in response to a person's refusal to incriminate himself. " *McKune v. Lile*, 536 U.S. 24, 49 (2002) (O'Connor, J., concurring). Rather, only "some penalties are so great as to 'compe[l]' [incriminating] testimony, while others do not rise to that level." *Id.* (first alteration in original). The Court in *McKune* considered whether a prison inmate was unconstitutionally compelled to incriminate himself when the state threatened a reduction in his prison privileges and housing accommodations if he refused to admit past offenses in response to sexual polygraph questions. *Id.* at 31. Justice O'Connor agreed in her concurring opinion with the plurality's conclusion that the state's threat to reduce prison privileges did not rise to the level of compulsion. *See id.* at 48-54 (O'Connor, J., concurring). But she did "not agree with the suggestion in the plurality opinion that these penalties could permissibly rise to the level of those . . . [like] longer incarceration . . . [that] are far greater than those we have already held to constitute unconstitutional

compulsion in the [so-called] penalty cases." *Id.* at 52.[7] *See id.* at 49-50 (citing

penalty cases including *Lefkowitz v. Cunningham*, 431 U.S. 801 (1977), and

*Turley*, 414 U.S. 70 (1973)).

While the holding in *McKune* sheds light on what penalties rise to the level

of compulsion in the context of prison inmates, Mr. Von Behren is on supervised

release, not in prison. As the Supreme Court made clear in *Morrissey v. Brewer*,

408 U.S. 471, 482 (1972), "[t]hough the State properly subjects [a parolee] to

many restrictions not applicable to other citizens, his condition is very different

from that of confinement in a prison." The Court in *Minnesota v. Murphy*, 465

U.S. 420 (1984), has spoken directly on the issue of Fifth Amendment compulsion

in the analogous probation context. The Court's decision in *Murphy*, and the

prior penalty cases it relies on, leads us to conclude that the government's threat

to revoke Mr. Von Behren's supervised release for his failure to answer

potentially incriminating questions rises to the level of unconstitutional

compulsion.

*Murphy* involved a man who was sentenced to three years' probation after

pleading guilty to false imprisonment, a reduced charge that arose from criminal

---

[7] We have recognized that Justice O'Connor's concurrence is the holding of
the Court in *McKune*. *See Searcy v. Simmons*, 299 F.3d 1220, 1225 (10th Cir.
2002) (citing rule from *Marks v. United States*, 430 U.S. 188, 193 (1977), that
"the holding of a fragmented Court may be viewed as that position taken by those
Members who concurred in the judgments on the narrowest grounds" (internal
quotation omitted)).

sexual conduct. *Id.* at 422. The terms of his probation required him to participate in a sex offender treatment program, "report to his probation officer as directed, and be truthful with the probation officer 'in all matters.'" *Id.* After Mr. Murphy stopped attending his treatment meetings, his treatment counselor informed his probation officer that Mr. Murphy had admitted to committing a rape and murder in 1974. *Id.* at 423. The probation officer confronted Mr. Murphy about the rape and murder, and he admitted he had in fact committed both crimes. *Id.* at 423-24. When Mr. Murphy refused the probation officer's admonition to turn himself in, the officer procured an arrest order.

Mr. Murphy was eventually charged with first-degree murder. *Id.* at 424-25. He sought to suppress his "confession on the ground[] that it was obtained in violation of the Fifth and Fourteenth Amendments." *Id.* at 425. The trial court found he was not in custody at the time and his testimony was therefore not compelled. *Id.* The Minnesota Supreme Court reversed, reasoning that the compulsory nature of the meeting constituted compulsion under the Fifth Amendment, even though Mr. Murphy failed to claim the privilege while being questioned. *Id.* The Supreme Court granted certiorari and reversed. Although the Court held that Mr. Murphy was not constitutionally compelled to give incriminating testimony, the Court's reasoning settles the compulsion issue in this case.

The Court started its analysis by noting that the Fifth Amendment privilege

is normally not self-executing, meaning that a witness must affirmatively claim it to realize its protections. *Id.* at 427-29. Although Mr. Murphy did not affirmatively claim the privilege, he argued that he fell within an exception to the general rule. *Id.* at 434-39. The Court addressed the first exception, confessions obtained from suspects in police custody, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and concluded that the pressure felt by suspects during a custodial interrogation was markedly different than the relaxed environment of a meeting between a probationer and his probation officer. *See id.* at 433.

The Court next turned to the exception for penalty cases, a line of cases in which the state "sought to induce [a witness] to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids,'" *id.* at 434 (quoting *Cunningham*, 431 U.S. at 806). The Court explained the central theme throughout most of the penalty cases was that "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Id.* (quoting *Cunningham*, 431 U.S. at 805). Notably, the Court cited cases where it had held that the state had "sought to induce [an individual] to forgo the Fifth Amendment privilege *by threatening* to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'" *Id.* (emphasis added) (citing *Turley*, 414 U.S. at 79-84).

But unlike many of the witnesses in the penalty cases, Mr. Murphy had not asserted his privilege. *Id.* at 434-35. Accordingly the Court discussed cases where "an individual succumb[s] to the pressure placed upon him, fail[s] to assert the privilege, and disclose[s] incriminating information, which the state later [seeks] to use against him in a criminal prosecution." *Id.* at 434 (citing *Garrity v. New Jersey*, 385 U.S. 493 (1967)). In *Garrity*, 385 U.S. at 498-99, the Court held that an individual who was threatened with losing his job if he refused to answer incriminating questions did not waive his Fifth Amendment privilege by responding to those questions "rather than standing on his right to remain silent." *Murphy*, 465 U.S. at 435. Relying on *Garrity*, the Court declared:

> There is thus a substantial basis in our cases for concluding that *if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation*, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Murphy*, *id.* at 435 (emphasis added).

The Court ultimately held that this flagship rule of Fifth Amendment jurisprudence did not apply to Mr. Murphy because his probation officer neither affirmatively stated nor implied that Mr. Murphy's assertion of the privilege would result in the revocation of his probation. *Id.* at 437-38. In other words, there was no threat. The Court noted that even though Mr. Murphy's terms of probation required him to be truthful when talking to his probation officer, the

-20-

terms said "nothing about his freedom to decline to answer particular questions and . . . contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Id.* at 437. The Fifth Amendment privilege was not available to Mr. Murphy because he did not claim it.[8] *Id*. at 438. Although the Court in *Murphy* concluded that no unconstitutional compulsion was threatened in Mr. Murphy's case, its analysis makes clear that the opposite is true in this case.

*Murphy* makes this case an easy one. It recognizes that a threat to revoke one's probation for properly invoking his Fifth Amendment privilege is the type of compulsion the state may not constitutionally impose. 465 U.S. at 426. The government asserted here that it would seek Mr. Von Behren's remand to prison if he refused to answer incriminating sexual polygraph questions because that refusal would (and did) ultimately result in his termination from the sex offender treatment program. The government's threat constituted unconstitutional compulsion within the meaning of the Fifth Amendment. *See United States v. York*, 357 F.3d 14, 24-25 (1st Cir. 2004) (recognizing it "would be constitutionally problematic" if supervised release provision requiring sex offender treatment "require[d] York to submit to polygraph testing . . . so that

_____

[8] If he had claimed it, even the state agreed that it could not have revoked his probation: "Indeed, in its brief in this Court, the State submits that it would not, and legally could not, revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings." *Murphy*, 465 U.S. at 438.

York's refusal to answer any questions—even on valid Fifth Amendment grounds—could constitute a basis for revocation"). The solution to this problem was suggested in *Murphy* over thirty years ago: "[A] state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." *Id.* at 435 n.7; *see also Turley*, 414 U.S. at 84-85 (state may compel waiver of Fifth Amendment privilege only by grant of immunity from prosecution).

The government counters that there was no unconstitutional compulsion because RSA terminated Mr. Murphy from treatment for not completing the polygraph exam and the government would be seeking a remand to prison for Mr. Von Behren's failure to complete treatment, not for his refusal to incriminate himself. We are not persuaded by this argument. Mr. Von Behren was not permitted to complete treatment solely and directly as a result of invoking his Fifth Amendment privilege and refusing to answer incriminating questions.[9] The government's argument is a distinction without a difference.

---

[9] The outcome would be different, and thus the government's argument would be valid, if Mr. Von Behren had refused to answer a question relevant only to his supervised release status (such as whether he had looked at pornographic material), or if he had refused to answer a question that did not involve the risk of self-incrimination, or if he were given immunity and still refused to answer any questions. But that is not this case.

-22-

The government also contends it is unclear whether the district court would revoke Mr. Von Behren's supervised release for the legitimate invocation of the Fifth Amendment privilege against self-incrimination. If the court would not send Mr. Von Behren to prison based on his termination from treatment for invoking his Fifth Amendment privilege, the government argues, then the necessary element of compulsion does not exist. The government is wrong. Imagine the following scenario: Mr. Von Behren is sitting in an RSA exam room and the polygraph examiner starts asking him a host of incriminating questions. Mr. Von Behren feels uncomfortable and says, "I don't know if I should answer that." The examiner responds by saying, "you can plead the Fifth if you want, but if you do, we will end your treatment." Mr. Von Behren asks to consult with probation and is told that if he gets thrown out of treatment for failing to answer the sexual polygraph questions, the government will seek revocation of his supervised release. Subsequently, Mr. Von Behren confesses to a crime, and the polygraph examiner reports his confession to the authorities. The police then find, arrest, and charge Mr. Von Behren for the crime. At a hearing to consider his motion to suppress the confession, Mr. Von Behren argues that the confession should be inadmissible because it violated his Fifth Amendment privilege against self-incrimination. The result is a virtual certainty: the confession will be thrown out. The court would quickly dispose of the state's argument by relying on *Garrity*, 385 U.S. at 499-500 (holding confessions of two police officers were

-23-

inadmissible at trial because they were obtained by telling officers they would lose jobs if they invoked their Fifth Amendment privilege), and *Murphy*, 465 U.S. at 435.

The government's position is that by changing one fact in the above hypothetical—instead of confessing, Mr. Von Behren asserts his right to remain silent and says nothing—the moment at which there is a constitutional violation changes as well. The government argues that in this latter scenario, there is no constitutional violation until a judge actually revokes Mr. Von Behren's supervised release. The government cites no authority for this bifurcated approach. A witness is compelled under the Fifth Amendment *as soon as the government threatens him* with a substantial penalty—it makes no difference whether he proceeds with answering or stands on his right. *See Turley*, 444 U.S. at 320-22 (holding state statute unconstitutional under Fifth Amendment because it *threatened* state contractors with cancellation of existing contracts, plus five-year disqualification for future contracts, for refusing to answer incriminating questions); *Bahr*, 730 F.3d at 966 ("When the government conditions continued supervised release on compliance with a treatment program requiring full disclosure of past sexual misconduct, with no provision of immunity for disclosed conduct, it unconstitutionally compels self-incrimination.").

In sum, we hold that the government compelled Mr. Von Behren to be a witness against himself. For the reasons set forth above, we **REVERSE**.