*This opinion is subject to revision before final publication in the Pacific Reporter*

**2016 UT 54**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

BRENDT THOMAS BENNETT,
*Appellant,*

*v.*

ALFRED BIGELOW, et al.,
*Appellee.*

No. 20140680
Filed November 25, 2016

On Petition for Extraordinary Relief

Sixth District, Manti
The Honorable Marvin D. Bagley
No. 20140683

Attorneys:

Linda M. Jones, Troy L. Booher, Erin B. Hull, Salt Lake City,
for appellant

Sean D. Reyes, Att'y Gen., Brent A. Burnett, Sharell S. Reber,
Asst. Att'ys Gen., Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM,
and JUSTICE HIMONAS joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1   Brendt Bennett claims that his Fifth Amendment rights were violated when he was required to disclose his entire sexual history, including any uncharged sexual crimes, as part of his sex offender treatment during parole. He refused to make these disclosures and his parole was revoked, requiring him to return to prison to potentially serve the remainder of his indeterminate six year to life sentence. The district court dismissed Mr. Bennett's Fifth Amendment challenge to the parole revocation at summary

judgment. We hold that Mr. Bennett has established that genuine issues of material fact exist that preclude the grant of summary judgment and reverse.

**Background**

¶ 2   Mr. Bennett pleaded guilty to one count of rape of a child, a first-degree felony, in August 2000. The district court sentenced him to an indeterminate sentence of six years to life. In 2007, after Mr. Bennett successfully completed an in-prison sex offender treatment program, the Board of Pardons and Parole (Board) granted him his first opportunity to be released on parole. He was paroled to the Bonneville Community Correctional Center (BCCC). As a condition of parole, Mr. Bennett was to successfully complete the BCCC sex offender program. The Department of Corrections was instructed to immediately notify the Board if Mr. Bennett was removed from the program.

¶ 3   As part of his first attempt in the BCCC program, Mr. Bennett was required to give a complete sexual history, including any past charged or uncharged sex offenses. He was given several assignments and other requirements in order to successfully complete the BCCC program, including treatment journals, psychosexual testing, an autobiography, and a polygraph test. One such assignment was to complete an "Offense Report." This report had two purposes: "First, to help [the offender] make a complete disclosure which is essential to a successful treatment experience. Second, to assist [the offender] in gaining a thorough picture of all details of [his or her] offense(s)." The instructions to the report "encouraged [the offender] to complete the assignment in a detailed way." As part of this report, the offender had to complete a "Victim Form" and a "Victim Narrative."

¶ 4   The instructions to the Victim Form stated that the offender must complete a separate form for "[e]very person with whom [the offender] had sexual contact [before the offender was 18 years of age] who was 3 years or more[] younger than [the offender]" as well as "[e]very person under 18 with whom [the offender] had any sexual contact" and "[a]ny person with whom [the offender] had non-consensual sexual contact" after the offender was 18 years old. The form itself required the offender to provide the victim's name, age, and sex as well as the offender's age at the time of first contact. The offender was then required to indicate the type and amount of sexual contact with the victim. The final part of the form required the offender to describe the month and year of the first and last sexual contact of any kind with the victim. The form did not indicate that

the person completing it should limit his or her responses in any way.

¶ 5 The instructions to the Victim Narrative required the offender to "[d]escribe all the activities . . . that are listed and counted on the victim form" and suggested that the narrative "[m]ay be several pages for each victim." There were nine specific requirements to a victim narrative: first, the offender was required to provide the victim's name or some other means to identify the victim. The instructions warned the offender to "not divulge the last names of victims to the group" and to "[u]se only the first name to protect your victim[']s identities." If the offender did not know or could not recall the name, the offender should "use some other means to identify the victim, such as 'My sister's 8-year[-]old friend.'" Second, the offender had to describe how the victim may have been related to the offender and how the offender became acquainted with the victim, with examples such as "your sister or brother or . . . your wife or girlfriend." Third, the offender had to provide the age of both the offender and victim when victimization began.

¶ 6 Fourth, the offender was required to detail "the entire story," including how the offender met the victim, how the offender got the victim alone, and how the offender "abused this victim," including whether the offender's behavior or tactics changed in an important way over time. Fifth, the offender had to provide the number of times the victimization occurred. The instructions provided as an example, "I abused Susie twice a week for six months." Sixth, the offender had to describe where the abuse took place, such as the victim's bedroom or in an abandoned building. Seventh, the offender was required to explain what he or she did to get the victim to cooperate. This required the offender to "[d]escribe what you said to the victim in order for the victim to feel the need to cooperate" and to "[t]hink about how your superiority may have influenced the victim." As examples, the instructions ask "was she your granddaughter, a stepchild, or 10 years younger." Eighth, the offender had to describe how he or she kept the victim from telling, such as deceit, threats, or other intimidation. Ninth, the offender was required to describe how the offense was discovered or, if it was not, to "write something [like] 'She never reported the abuse and I was never caught.'" Mr. Bennett completed both the Victim Forms and the Victim Narratives during his first attempt in the BCCC program. Prior to doing so, he was not given a warning to limit his disclosures in any way.

¶ 7   Mr. Bennett was also required to undergo therapy during his first attempt in the program. During this therapy, Mr. Bennett orally disclosed detailed information about uncharged sex offenses against five victims to his BCCC therapist, Ann Erickson, as part of providing his sexual history disclosure. Ms. Erickson did not warn him about any duty to report prior to this disclosure. Immediately after Mr. Bennett had provided specific information about the five victims, Ms. Erickson told him he should not have specifically identified the victims as it triggered her duty to report the offenses. Mr. Bennett states in his opening brief that the uncharged offenses he initially reported were not incriminating because the State was aware of these offenses before the initial prosecution and the statute of limitation had run.

¶ 8   Also as part of Mr. Bennett's first attempt in the BCCC program, Mr. Bennett was required to undergo a polygraph test verifying that he had fully disclosed his sexual history. The questions the examiner asked during Mr. Bennett's first exam during his first parole and attempt in the program included the following: "Since turning eighteen, have you sexually touched the genitals of any minors other than your victim of conviction?"; "Are you intentionally withholding any of the sexual abuse you perpetrated against [your victim of conviction]?"; "Do you have sexual victims that you are intentionally withholding from your therapist?"; "Other than what we discussed, have you forced anyone to have physical sexual contact prior to your date of conviction?"; and "Have you intentionally withheld any victims from your sexual history report?" Mr. Bennett invoked his Fifth Amendment right against self-incrimination and, though he answered some of the questions in a general way, he refused to provide more specific answers. He claims that the "treatment team pointedly demanded answers to questions that would require me to incriminate myself," and that BCCC staff "called [his] non-incriminating answers 'vague.'" Mr. Bennett failed the initial polygraph test and a second polygraph was scheduled. At the second polygraph examination, he again invoked his Fifth Amendment rights and again failed.

¶ 9   A warrant was subsequently issued for Mr. Bennett's arrest. The authorities sought the warrant because of Mr. Bennett's failure to successfully progress in the BCCC program. BCCC staff stated that he presented "as artificial and emotionally closed off in therapy" and was "manipulative and admits to being purposefully deceitful." Further, because of his shortcomings in the program, they considered him "a risk to community safety." Mr. Bennett also alleges that the BCCC program director, Mr. Greenberg, told him

while arresting him that "[y]ou claimed a Fifth Amendment right. When you do that you can't complete the program."

¶ 10 Mr. Bennett challenged the State's grounds for revoking his parole. The Board held a revocation and evidentiary hearing.[1] The State submitted the affidavit of BCCC supervisor Craig Greenberg describing the general procedures for parolees in treatment.[2] In the affidavit, Mr. Greenberg stated that "[o]ffenders are told how to appropriately disclose uncharged victim information at many stages of therapy, including the intake process, during their first treatment team hearing, in their various group meetings, and reinforced

---

[1] In connection with this hearing, Mr. Bennett submitted the affidavit of David Legrande Draper. In his affidavit, Mr. Draper stated that he is a prison inmate who entered the Utah State Prison's sex offender program in April 1991 and was subsequently prosecuted for admissions that he was required to make during the program. Specifically, Mr. Draper stated "[t]hat the prison's Sex Offender Program required full disclosure of all affiant's past offenses," and "that 'full disclosure' was defined as including names, dates, places, and a full description of offenses." Although Mr. Bennett has attempted to rely on this affidavit in support of his claim that he was asked to provide a "self-incriminating full disclosure" in the BCCC program, the affidavit describes only the prison sex offender program, not the BCCC program, and so is unhelpful.

[2] We note that the State's reliance on the affidavit of the BCCC program director is somewhat troubling. It does not appear that Mr. Greenberg had personal knowledge of the events in question—the various therapy sessions and polygraph tests—and that he only provides generalized information as to program guidelines. Although Mr. Greenberg may be a credible witness as to what usually occurs in the program, at summary judgment "it is not for a court to weigh the evidence or assess credibility." *Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983). We are therefore reluctant to credit such generalized statements about what Mr. Greenberg believes happens in the program over the more specific statements of Mr. Bennett as to what he claims actually did happen in his attempts in the program, especially given that "[a] single sworn statement is sufficient to create an issue of fact" and we are required to construe all doubts, uncertainties, and inferences in the light most favorable to Mr. Bennett. *Id.*

during offender's individual therapy sessions." Further, Mr. Greenberg stated that offenders are instructed to identify the victim only by gender and age. And they are specifically warned "not to disclose identifying information such as the victim's name or other identifying features, the nature of the relationship with the victim, or where the abuse took place." Mr. Greenberg also said that he was "not aware of any offender who has been prosecuted during the 13 years [he has] been associated with the Sex Offender Treatment program, based on the general disclosure information required as part of the sex offender treatment."

¶ 11 In the affidavit, Mr. Greenberg also made clear the role of the BCCC in relation to the decision to revoke parole. He stated that the "Department is under a statutory obligation to provide the Board progress reports as to the sex offender's participation or nonparticipation in sex offender treatment." The BCCC staff makes recommendations about parole status, but the Board makes the final parole decisions. Mr. Greenberg observed that the Board has "paroled sex offenders where a treatment staff's recommendation has been against parole, and the Board has continued incarceration where staff has recommended parole." He described the BCCC staff recommendations as one of "a myriad of factors" the Board considers when making parole determinations. Mr. Greenberg did not discuss the specifics of Mr. Bennett's case.

¶ 12 After considering Mr. Bennett's self-incrimination claim, the hearing officer found that the general program, as described by Mr. Greenberg, would not have violated Mr. Bennett's rights. But it appears that the hearing officer did intend to proceed with an evidentiary hearing because of concerns about whether the program, as applied to Mr. Bennett, may have violated his rights.[3] Mr. Bennett pleaded no contest, however, in order to "pursue that issue in federal court." The Board then revoked Mr. Bennett's parole.

---

[3] The hearing officer states that he "found that under the circumstance in which a parolee can be subject to re-incarceration upon AP&P's [Adult Probation & Parole] request for a BOPP [Board of Pardons and Parole] warrant for failure of the SOT [Sex Offender Treatment] program in a CCC [Community Correctional Center] for not providing information deemed necessary for SOT completion by program administrators [], the parolee is compelled under the color of authority to provide the information sought or face expulsion from the program."

¶ 13 A month later, the Board again released Mr. Bennett on parole on the condition that he successfully complete the BCCC sex offender treatment program. It is not clear from the record what requirements or assignments, aside from therapy, Mr. Bennett was required to complete as part of his second attempt in the program, or whether those requirements and assignments were the same as in his first attempt, as his second attempt was short-lived. Indeed, his second parole, which included his second attempt to successfully complete the BCCC program, lasted only ten days.

¶ 14 The only evidence in the record as to what Mr. Bennett was required to do in his second attempt indicates that he attempted to engage in therapy and almost immediately failed the program. Mr. Bennett claims that he

> met with the sex offender program therapist for an initial interview. The therapist made it clear to [him] that in order to successfully complete the [B]CCC sex offender program [he] must agree to abandon [his] legal position about self-incrimination and provide a self-incriminating full disclosure. [He] refused to do so and asserted a claim against self-incrimination.

The BCCC puts forth a starkly different version of the encounter in the "treatment summary" it provided when it recommended that parole be revoked. The treatment summary states that at this initial meeting with his therapist—the beginning of his second attempt in the BCCC program—Mr. Bennett read a statement attributed to his lawyer that "[i]f Mr. Bennett is removed from treatment[,] he will file a lawsuit and will most likely prevail." The therapist then reminded Mr. Bennett that he needed to fully participate in the program including "discussing his issues of sexual deviancy" and reviewed the BCCC's disclosure protocols. Specifically, Mr. Bennett "was told the program expectations regarding uncharged crimes are that he disclose age and gender of the victim and the deviant sexual act perpetuated. He was notified that he [was] not expected to provide any identifying information that would trigger a duty to report." Mr. Bennett responded that "he knew this and that he and treatment staff had 'gone over it many times,'" but that he was still invoking the Fifth Amendment to refuse to answer what he considered to be incriminatory questions.

¶ 15 The BCCC consequently sought a warrant, stating in its Warrant Request & Parole Violation Report that Mr. Bennett was "being removed from [the program] because he demonstrates an unwillingness to comply with treatment guidelines . . . and program

expectations." The report also noted that this was the same behavior and unwillingness that caused his first parole to be revoked. The Board issued another warrant for his arrest and eventually revoked its second grant of parole to Mr. Bennett.

¶ 16 Mr. Bennett filed a Petition for Extraordinary Relief in September 2009 against Warden Alfred Bigelow and the Utah Board of Pardons and Parole (collectively, "State"), claiming, *inter alia*, that the BCCC program unconstitutionally required him to incriminate himself. With his petition, Mr. Bennett included a request that the court appoint pro bono counsel, which the court denied. The State filed a motion for summary judgment, which Mr. Bennett opposed, again asking the court to appoint counsel. The district court granted the State's motion after finding that no issues of material fact existed that would preclude summary judgment. The court also again denied Mr. Bennett's request for counsel, concluding that the second request was, under the applicable Utah Rules of Civil Procedure, an inappropriate motion to reconsider the court's prior denial. Mr. Bennett now appeals the district court's refusal to appoint counsel as well as its grant of summary judgment on the constitutionality of the BCCC's requirement that he disclose previously undisclosed criminal acts. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

## Standard of Review

¶ 17 Mr. Bennett raises two issues on appeal. First, he asks us to review the district court's decision to deny his second request for appointment of counsel as a misapplication of the Rules of Civil Procedure. While a decision to reconsider an issue already ruled upon is in the discretion of the district court,[4] the interpretation of the rules of civil procedure is a legal issue we review for correctness. Second, he asks us to review the district court's decision on summary judgment that the State did not violate Mr. Bennett's Fifth Amendment rights. "[W]e review a grant of 'summary judgment for correctness, granting no deference to the [lower] court.'"[5] Summary judgment is appropriate only "when the record shows that there is no genuine issue as to any material fact and that the moving party is

---

[4] *See IHC Health Servs. Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 27, 196 P.3d 588.

[5] *Ross v. State*, 2012 UT 93, ¶ 18, 293 P.3d 345 (second alteration in original) (citation omitted).

entitled to a judgment as a matter of law."[6] In reviewing the trial court's decision, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," which in this case is Mr. Bennett.[7]

## Analysis

¶ 18 Our discussion of Mr. Bennett's claims proceeds as follows: First we address his argument that the trial court erred in concluding that rule 54 of the Utah Rules of Civil Procedure prevented it from considering his second request for counsel. We hold that the court erred in its interpretation of the rule and instruct the court, on remand, to reconsider whether counsel should be appointed for Mr. Bennett. We then address his claim that the requirement that he disclose charged and uncharged sex crimes as part of his sex offender treatment on parole violated his Fifth Amendment right to be free from compelled self-incrimination. We first note that Mr. Bennett has established standing to assert this claim and then address the claim on the merits, concluding that Mr. Bennett has established that genuine issues of material fact exist that preclude summary judgment. Accordingly, we reverse the grant of summary judgment and remand.

### I. The Trial Court Erred by Refusing to Consider Whether to Appoint Counsel

¶ 19 Mr. Bennett twice requested that he be appointed counsel: First when he filed his petition and second after he filed his response to the State's motion for summary judgment. The trial court, recognizing that it had the discretion to appoint counsel under Utah Code section 78B-9-109(1), denied the first request based on its evaluation of the two factors found in section 78B-9-109(2).[8] When

---

[6] *Id.* (citation omitted).

[7] *Id.* (citation omitted).

[8] The two factors are "whether the petition . . . contains factual allegations that will require an evidentiary hearing" and "whether the petition involves complicated issues of law or fact that require the assistance of counsel for proper adjudication." UTAH CODE § 78B-9-109(2)(a)–(b). The court concluded that "an evidentiary hearing [was] unnecessary" because the "case pertains to actions by the Board of Pardons and Parole which all have a record." It also determined that Mr. Bennett's case did "not include complicated issues of law or fact that would require the assistance of counsel."

Mr. Bennett again requested that counsel be appointed, the court considered the request to be a motion to reconsider its earlier denial of Mr. Bennett's request for counsel. The court found "no provision in the [Rules of Civil Procedure] for motions for reconsideration" and stated that rule 54, the basis for Mr. Bennett's argument, applies only to "judgments," which are "order[s] from which an appeal lies." Since the prior denial was not such an order, the court concluded that it did not have the ability to reconsider it and again denied Mr. Bennett's request.

¶ 20 The trial court's conclusion that rule 54 prevented it from reconsidering Mr. Bennett's request for counsel was erroneous. Indeed, the parties agree as to this point. Rule 54 contemplates orders and other decisions that "adjudicate[] fewer than all the claims or the rights and liabilities of fewer than all the parties."[9] Such orders do "not end the action . . . and *may be changed at any time before the entry of judgment*."[10] Although "this court has consistently held that our rules of civil procedure do not provide for a motion for reconsideration of a trial court's order or judgment," a motion such as Mr. Bennett's is, "in essence, not a motion for reconsideration at all, but simply a reargument" of the motion or request that gave rise to the prior order.[11] And under rule 54, "a trial court is free to entertain [the reargument] at any point prior to entry of a final order or judgment."[12]

¶ 21 Accordingly, the trial court erred when it concluded that rule 54 prohibited its consideration of Mr. Bennett's second request for counsel. And because we reverse the grant of summary judgment, the court on remand should consider whether counsel should be appointed for future proceedings under Utah Code section 78B-9-109.[13] We turn now to the issue of whether Mr. Bennett has standing to assert a Fifth Amendment challenge.

---

[9] UTAH R. CIV. P. 54(b)

[10] *Id.* (emphasis added).

[11] *Ron Shepherd Ins. Inc. v. Shields*, 882 P.2d 650, 653 n.4 (Utah 1994).

[12] *Id.*

[13] We decline to resolve this issue on appeal as we recognize that the trial court will be in a far better position to weigh the particular circumstances of the case. We note only that, given the result we

(Continued)

II. Mr. Bennett Has Standing to Assert His Fifth Amendment Claim

¶ 22 After oral argument in this case, we asked the parties to brief the question of whether Mr. Bennett had established that he had standing to assert his Fifth Amendment claim, in order to ensure that we had jurisdiction.[14] After reviewing the parties' briefs and the record in this case, we conclude that Mr. Bennett has established standing under the standard articulated in *Brown v. Division of Water Rights*.[15] As we discuss in the next section, Mr. Bennett has established that issues of material fact exist as to whether he was compelled to provide incriminating information as part of the BCCC program. Thus, Mr. Bennett has established "a reasonable probability" of an injury[16] that has at least "some causal relationship" with "the governmental actions and the relief requested."[17] And because a judicial order reinstating Mr. Bennett's parole and forbidding the alleged unconstitutional questioning would redress Mr. Bennett's alleged injury[18]—the violation of his Fifth Amendment rights in the program—Mr. Bennett has established each prong of our three-part standing test.[19] We turn

reach in this case today, there exist issues of fact that remain to be resolved upon remand.

[14] *See Brown v. Div. of Water Rights*, 2010 UT 14, ¶¶ 12–13, 228 P.3d 747 (holding that standing is a jurisdictional issue that "raise[s] fundamental questions regarding a court's basic authority over the dispute").

[15] *Id.* ¶¶ 14–15, 17 (noting that standing requires a party to establish "injury, causation, and redressability," which is "evaluated under the standard used for a dispositive motion at the relevant stage of litigation").

[16] *Id.* ¶ 19.

[17] *Jenkins v. Swan*, 675 P.2d 1145, 1150 (Utah 1983).

[18] *See id.* (stating that standing requires a plaintiff to establish that "the relief requested is substantially likely to redress the injury claimed").

[19] *Cf. United States v. Antelope*, 395 F.3d 1128, 1132–33 (9th Cir. 2005) (holding that a probationer's Fifth Amendment claim was justiciable because "the government violated his Fifth Amendment right when it conditioned his probation and supervised release on the submission of a sexual autobiography that we may assume would have revealed prosecutable offenses").

now to our analysis of the merits of Mr. Bennett's Fifth Amendment claim.

### III. Genuine Issues of Material Fact Exist as to Mr. Bennett's Fifth Amendment Claim

¶ 23 The Fifth Amendment of the United States Constitution guarantees that no person "shall be compelled in any criminal case to be a witness against himself."[20] The protections offered by the Fifth Amendment extend beyond the context of a criminal trial, granting an individual the right "not to answer official questions put to him in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."[21] And this right is not lost by conviction and incarceration. Indeed, the United States Supreme Court has specifically held that "[a] defendant does not lose [Fifth Amendment] protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements."[22] Thus, Mr. Bennett retains the rights guaranteed by the Fifth Amendment throughout his incarceration and any periods of parole.

¶ 24 Whether Mr. Bennett may properly invoke the Fifth Amendment to avoid answering questions depends on whether he can satisfy a two-prong test: "(1) that the testimony desired by the government carried the risk of incrimination . . . , and (2) that the penalty he suffered amounted to compulsion."[23] Because Mr. Bennett's claim was dismissed on summary judgment, he must establish that genuine issues of material fact exist as to both of these prongs. We discuss each in turn, beginning with whether the BCCC program's questioning carried a risk of incrimination and ending with whether the revocation of parole for refusing to answer incriminating questions amounts to compulsion. We conclude that Mr. Bennett has demonstrated issues of material fact as to both prongs and reverse the grant of summary judgment.

---

[20] U.S. CONST. amend. V.

[21] *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (citation omitted).

[22] *Id.*

[23] *United States v. Antelope*, 395 F.3d 1128, 1134 (9th Cir. 2005) (citations omitted).

*A. There Are Issues of Material Fact as to Whether Mr. Bennett's Disclosures in the BCCC Program Would Be Incriminatory*

¶ 25 The first prong of the Fifth Amendment analysis asks whether "the testimony desired by the government carried the risk of incrimination."[24] The trial court did not address this prong of the analysis in making its decision, instead relying entirely on cases addressing the issue of compulsion: *McKune v. Lile*[25] and *State v. Pritchett*.[26] In its brief responding to Mr. Bennett, the State likewise did not argue that the BCCC questioning posed no risk of incrimination, even though Mr. Bennett had argued that he did indeed face a risk of incrimination due to the program's requirement that he disclose charged and uncharged sex crimes. Instead, the State rested its argument entirely on its claim that, even if the required information was incriminating, Mr. Bennett was not compelled to provide the information. Accordingly, the State has effectively conceded that an issue of fact exists as to whether the BCCC questioning posed some risk of incrimination. This position is understandable given the low bar necessary to establish such a risk.[27]

---

[24] *Id.* (citations omitted).

[25] 536 U.S. 24 (2002).

[26] 2003 UT 24, 69 P.3d 1278.

[27] The United States Supreme Court "has always broadly construed [Fifth Amendment] protection to assure that an individual is not compelled to produce evidence which later may be used against him." *Maness v. Meyers*, 419 U.S. 449, 461 (1975). Accordingly, the definition of what constitutes "incriminating" information is broad: "[t]he protection does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution." *Id.* Therefore, "[n]ot much is required . . . to show an individual faces some authentic danger of self-incrimination . . . , as the privilege 'extends to admissions that may only *tend* to incriminate.'" *United States v. Rivas-Macias*, 537 F.3d 1271, 1278 (10th Cir. 2008) (citation omitted) (quoting *Emspak v. United States*, 349 U.S. 190, 197 (1955)). And the witness need not specifically identify how an answer to a question would be incriminating, as "it need only be evident from the implications of the question, in the setting in which it is asked,

(Continued)

¶ 26 The State did cursorily suggest in its supplemental briefing on standing that because the BCCC program director, Mr. Greenberg, stated that Mr. Bennett was warned to not provide incriminating information as per program policies, there was no risk of incrimination.[28] Even if we were to permit the State to raise this issue for the first time by way of supplemental briefing on a jurisdictional issue and to assume it to be adequately briefed, all the director's statement does is establish that an issue of fact remains as to what Mr. Bennett was required to disclose. Mr. Greenberg's statement that the BCCC program does not require offenders to "disclose identifying information such as the victim's name . . . the nature of the relationship with the victim, or where the abuse took place" is specifically contradicted by the Victim Form and Victim Narrative. These reports require offenders to disclose the victim's name (possibly limited to only the first name), the relationship between the victim and the offender (such as "your sister or brother or . . . your wife or girlfriend"), how the offender met and became aware of the victim, how the offender exerted control over the victim (such as by using a relationship like "she [was] your granddaughter [or] a stepchild"), and where the abuse took place. We therefore hold that Mr. Bennett has established that a genuine issue of material fact exists as to the first prong of the Fifth Amendment analysis—whether he faced a risk of incrimination. We turn now to the second prong of the test: whether Mr. Bennett has established that an issue of fact exists as to whether he was compelled to answer the potentially incriminating questions.

*B. There Are Issues of Material Fact as to Whether Mr. Bennett Was Compelled to Provide the Incriminatory Information*

¶ 27 The Fifth Amendment protection against self-incrimination does not extend to all circumstances in which the State asks incriminating questions. Instead, it applies only when the State

---

that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486–87 (1951). Ultimately, we will uphold the invocation of the Fifth Amendment unless it is "'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency' to incriminate." *Id.* at 488 (citations omitted).

[28] The State raised this point to argue that Mr. Bennett could not satisfy the injury prong of our standing test. *See supra* Part II.

"threaten[s] to inflict potent sanctions unless the constitutional privilege is surrendered."[29] There must be some "attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity."[30] Of course, the Fifth Amendment "does not prohibit all penalties levied in response to a person's refusal to incriminate himself," as only "some penalties are so great as to 'compe[l]' [incriminating] testimony."[31] Thus, the second prong of the Fifth Amendment analysis requires us to determine whether the State has either explicitly or implicitly threatened to impose some penalty that "rises to a level where it is likely to 'compe[l]' a person 'to be a witness against himself.'"[32]

¶ 28 The question before us is whether Mr. Bennett faced a threat of a significant penalty—revocation of his parole—and whether that penalty rises to the level of compulsion. As to the first question, the United States Supreme Court has indicated that there is an express or implied threat of revocation of probation[33] when the state imposes as a condition of probation an "obligation that [the probationer] refrain from raising legitimate objections to furnishing information that might lead to his conviction for another crime."[34] Thus, we must look to whether Mr. Bennett has established that an issue of fact remains as to whether his parole was conditioned on his waiver of any Fifth Amendment claims regarding the information that was requested.

¶ 29 When the record and all inferences are viewed in the light most favorable to Mr. Bennett, we believe that there is a dispute of fact as to whether the State actually threatened Mr. Bennett with revocation of parole for the invocation of the Fifth Amendment. Mr. Bennett alleges that the BCCC program director, Mr. Greenberg, explained why Mr. Bennett's first parole was revoked by stating,

---

[29] *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977).

[30] *Id.* at 806 (citation omitted).

[31] *McKune v. Lile*, 536 U.S. 24, 49 (2002) (O'Connor, J., concurring) (first alteration in original).

[32] *Id.*

[33] As we discuss below, we see no significant difference between probation and parole and accordingly conclude that the Supreme Court's guidance is applicable here.

[34] *Minnesota v. Murphy*, 465 U.S. 420, 437 (1984).

"[y]ou claimed a Fifth Amendment right. When you do that you can't complete the program." This allegation colors Mr. Bennett's second parole and attempt in the program—the attempt at issue in this case—because the Warrant Request & Parole Violation Report submitted by the State after Mr. Bennett's initial therapy session recommended that Mr. Bennett's second parole be revoked because he was acting in the same way as he did during his first parole and was failing again to meet program expectations.[35] Thus, there is a reasonable inference that Mr. Bennett's second parole was conditioned, as was his first, on a requirement that he answer questions without raising a Fifth Amendment claim.[36]

¶ 30 This inference is supported by the other portions of the Report. The Report details that during the therapy session, Mr. Bennett acknowledged that he had been informed "many times" that "he [was] not expected to provide any identifying information that would trigger a duty to report" and that he was being required only to "disclose age and gender of the victim and the deviant sexual acts he perpetrated." Although the record is clear that Mr. Bennett was warned not to give the name of the victim, the State does not define what information was considered "identifying"—and thus not required—and what information was considered necessary to explain "the deviant sexual acts [Mr. Bennett] perpetrated." And

---

[35] The Report stated: "This was Mr. Bennett's second parole. He has only been on parole for approximately 10 days. His first parole was violated for similar type behavior [sic] and an unwillingness to comply with sex offender treatment and parole expectations."

[36] *See USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 38, 235 P.3d 749 (holding that creation of an inference from an undisputed fact can create a genuine issue of fact sufficient to preclude summary judgment). We note that the record contains an allegation that Mr. Bennett's second parole was expressly conditioned on his surrender of his Fifth Amendment claim. In his verified petition, Mr. Bennett alleged that during the therapy session in his second attempt in the program, "[t]he therapist made it clear to [him] that in order to successfully complete the [B]CCC sex offender program [he] must agree to abandon [his] legal position about self-incrimination and provide a self-incriminating full disclosure." But Mr. Bennett failed to cite this allegation in his opposition to the State's motion for summary judgment below, and accordingly we cannot consider it as part of his argument on appeal. We refer to this allegation only to highlight the factual issues that remain to be resolved on remand.

given the explicit disclosure requirements discussed above, we cannot say that the program's disclosure requirements—even limited as suggested by the Parole Violation Report—did not bear some risk of incrimination.[37] Thus, despite Mr. Bennett's acknowledgement of the limited disclosure requirements during his second attempt in the program, when the record and all inferences are viewed in the light most favorable to Mr. Bennett, there remains an issue of fact whether a condition that Mr. Bennett participate in a program with the acknowledged limitations effectively conditioned Mr. Bennett's parole on his waiver of his Fifth Amendment claim.[38]

---

[37] For example, if Mr. Bennett were required to indicate that he obtained control over his victims in order to perform his deviant acts by using his familial relationship with the victim, this information, in connection with the age and gender of the victim, could "tend to incriminate." *Emspak v. United States*, 349 U.S. 190, 197 (1955). And the circumstances of the questioning, when combined with Mr. Bennett's reluctance to respond even after the instruction to not provide a name, suggest that it would be reasonable to infer that truthful answers to even the limited questions could potentially reveal incriminating information. *See United States v. Von Behren*, 822 F.3d 1139, 1145 (10th Cir. 2016) ("Given his reluctance to submit to the polygraph, we infer that Mr. Von Behren's answers to these questions would reveal past sex crimes."); *United States v. Antelope*, 395 F.3d 1128, 1135 (9th Cir. 2005) ("Based on the nature of this [sexual polygraph] requirement and [Mr.] Antelope's steadfast refusal to comply, it seems only fair to infer that his sexual autobiography would, in fact, reveal past sex crimes.").

[38] *Cf. Von Behren*, 822 F.3d at 1150 (holding that the state threatened a sex offender with revocation of supervised release by conditioning the release on successful completion of a sex offender treatment program that required an offender to truthfully respond during a polygraph test); *Antelope*, 395 F.3d at 1138–39 (9th Cir. 2005) (same); *United States v. York*, 357 F.3d 14, 24–25 (1st Cir. 2004) (holding that there was no threat of revocation of supervised release because the court construed a condition of the release as prohibiting revocation based on a valid assertion of the Fifth Amendment); *United States v. Lee*, 315 F.3d 206, 212 (3d Cir. 2003) (holding that there was no threat of revocation because the offender's probation was not conditioned on a waiver of Fifth Amendment claims).

¶ 31 There is a similar dispute of fact as to whether the State would necessarily revoke Mr. Bennett's parole for failing to waive his Fifth Amendment claim. The State points to Mr. Greenberg's affidavit, wherein he stated that while the BCCC staff offer recommendations about parole status, such recommendations are not binding on the Board, which is the ultimate decision maker. Mr. Greenberg also claimed that the Board has "paroled sex offenders where a treatment staff's recommendation has been against parole, and the Board has continued incarceration where staff has recommended parole." Mr. Bennett responds by pointing to the fact that completion of the BCCC (or other similar) sex offender treatment program has been an express condition of both of his paroles. And failure to adequately discuss uncharged sexual conduct because of his Fifth Amendment claim has caused Mr. Bennett to fail the program on two separate occasions, leading to the revocation of his parole in both instances. Accordingly, there are issues of fact as to whether the State threatened to revoke Mr. Bennett's parole for refusing to waive his self-incrimination claim.

¶ 32 Even assuming that the State threatened Mr. Bennett with the revocation of his parole in order to encourage him to waive his Fifth Amendment rights, however, the question remains as to whether such a threat rises to the level of compulsion. As we discuss below, we join the Ninth and Tenth Circuits in concluding that the threat of revocation of the conditional liberty interest obtained by a parolee does rise to the level of compulsion. Accordingly, we hold that Mr. Bennett has established that a genuine issue of material fact exists as to whether he was compelled to offer incriminatory testimony.

¶ 33 The State's entire argument rests on its assertion that Mr. Bennett cannot claim that the revocation of parole is compulsory because he has no constitutional or other inherent right to parole.[39] Although this is true, it is beside the point. The question before us today is whether the State can permissibly revoke parole once it is given, not whether the State could have permissibly withheld the opportunity for parole in the first place. "There is a crucial distinction between being deprived of a liberty one has, as in parole,

---

[39] *See Malek v. Haun*, 26 F.3d 1013, 1015 (10th Cir. 1994) ("Not only is there no constitutional or inherent right to receive parole prior to the expiration of a valid sentence, but, absent state standards for the granting of parole, decisions of a parole board do not automatically invoke due process protections.").

and being denied a conditional liberty that one desires."[40] Although "[p]arole is not absolute liberty as all law-abiding citizens enjoy, but only conditional liberty dependent upon compliance with parole restrictions,"[41] it is a liberty interest "that warrants constitutional protection."[42]As the United States Supreme Court has recognized:

> Though the State properly subjects [a parolee] to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. . . . [T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others.[43]

Thus, there is an important distinction between a decision to grant or deny parole to an inmate and a decision to revoke parole once granted.

¶ 34 This distinction renders inapposite the majority of the cases relied upon by the trial court and the State. The trial court's decision was based on a United States Supreme Court case, *McKune v. Lile*,[44] and our own case, *State v. Pritchett*.[45] The State likewise relies on those cases and also cites a number of cases from other jurisdictions. These cases are all centered in the "prison context"[46] and suggest that denial of certain benefits *in prison* may not necessarily rise to the level of compulsion.[47] For example, in *McKune*, a plurality of the

---

[40] *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 9 (1979).

[41] *Ward v. Smith*, 573 P.2d 781, 782 (Utah 1978).

[42] *Linden v. State, Dep't of Corr.*, 2003 UT App 402, ¶ 13, 81 P.3d 802.

[43] *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

[44] 536 U.S. 24 (2002).

[45] 2003 UT 24, 69 P.3d 1278.

[46] *McKune*, 536 U.S. at 40 (stating that constitutional principles "are not easily extended to the prison context") (Kennedy, J., concurring)).

[47] *See, e.g., DeFoy v. McCullough*, 301 F. App'x 177, *3–*4 (3d Cir. 2008) (holding that a denial of reparole for failure to admit to sex offenses during treatment did not constitute compulsion); *Searcy v.*

(Continued)

United States Supreme Court rejected the argument "that the denial of discrete prison privileges for refusal to participate in a [pre-release, in-prison] rehabilitation program amounts to unconstitutional compulsion."[48] Likewise, in *Pritchett*, we held that a statute that "requires [an inmate] to admit the offense for which he has been convicted in order to be considered for probation" did not violate the Fifth Amendment.[49] But the question of what types of in-prison benefits may be denied or revoked without violating the Fifth Amendment—a question that has not yet been fully answered by this court or the United States Supreme Court[50]—is not before us today. Thus, the cases relied upon by the State simply do not address the question that we must decide: whether the revocation of parole—as opposed to the disqualification of an inmate for a grant of parole—qualifies as compulsion.

¶ 35 The case that does control this issue is the United States Supreme Court case of *Minnesota v. Murphy*,[51] where the Court recognized that revocation of probation qualifies as compulsion. In that case, Mr. Murphy pleaded guilty to a reduced charge of false imprisonment in connection with a prosecution for criminal sexual conduct.[52] He was released on probation, which required that he participate in a sex offender treatment program and report to a

---

*Simmons*, 299 F.3d 1220, 1226–27 (10th Cir. 2002) (holding that a requirement that an inmate complete a sex offender treatment program that requires incriminatory information or face denial of good-time credits and other privileges did not qualify as compulsion); *Ainsworth v. Staley*, 317 F.3d 1, 4–6 (1st Cir. 2002) (holding that requiring convicted sex offenders to disclose histories of sexual misconduct as part of an in-prison program in order to qualify for parole did not constitute compulsion).

[48] *McKune*, 536 U.S. at 40 (Kennedy, J., concurring).

[49] 2003 UT 24, ¶¶ 27, 36.

[50] *See McKune*, 536 U.S. at 30–31, (Kennedy, J., concurring) (agreeing that the transfer from a medium-security unit to a maximum-security unit is not compulsion, but leaving unresolved whether an extension of the inmate's term of incarceration or a denial of the ability to earn good-time credits or qualify for parole would amount to compulsion).

[51] 465 U.S. 420 (1984).

[52] *Id.* at 422.

probation officer.[53] His failure to comply with any of these conditions could result in a probation revocation hearing.[54] During treatment, Mr. Murphy admitted to committing a rape and murder.[55] His counselor informed the probation officer of the admissions, who set up a meeting with Mr. Murphy.[56] During the meeting, the officer told Mr. Murphy about the information she had obtained, and Mr. Murphy admitted that the information was true.[57] The officer later obtained an arrest warrant, and Mr. Murphy was eventually charged with first-degree murder.[58]

¶ 36 Ordinarily, a witness "must assert the privilege rather than answer if he desires not to incriminate himself."[59] Despite having never invoked the Fifth Amendment during treatment or his meeting with the probation officer, Mr. Murphy "sought to suppress testimony concerning his confession on the ground that it was obtained in violation of the Fifth and Fourteenth Amendments."[60] He argued that "[b]ecause revocation of his probation was threatened if he was untruthful with his probation officer, . . . he was compelled to make incriminating disclosures instead of claiming the privilege."[61] The Supreme Court agreed that the failure to invoke the Fifth Amendment could be excused so long as the state has "sought to induce [the witness] to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'"[62]

¶ 37 The Court then discussed whether the threat of revocation of probation rises to the level of compulsion. It ultimately concluded "that if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it

---

[53] *Id.*

[54] *Id.*

[55] *Id.* at 423.

[56] *Id.*

[57] *Id.* at 423–24.

[58] *Id.* at 424–25.

[59] *Id.* at 429.

[60] *Id.* at 425.

[61] *Id.* at 434.

[62] *Id.* (citation omitted).

would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled."[63] Thus, the Court recognized that requiring a probationer to surrender his Fifth Amendment right against self-incrimination in order to retain his probation constitutes compulsion. Despite this conclusion, the Court ultimately held that Mr. Murphy had not actually been threatened with revocation of his parole during his meeting with his probation officer, and thus his confession was admissible.[64]

¶ 38 *Murphy* provides clear direction that guides our analysis: the threat of revocation of the conditional liberty interest attendant to probation constitutes compulsion. Both the Ninth and Tenth Circuits have considered *Murphy*'s direction to be controlling in factual scenarios virtually identical to the one before us, holding that the threat of revocation of probation or supervised release for refusal to make self-incriminating disclosures in a sex offender treatment program constitutes compulsion.[65] The State urges us, however, to

---

[63] *Id.* at 435.

[64] *Id.* at 438–39 ("[Mr.] Murphy was not expressly informed during the crucial meeting with his probation officer that an assertion of the privilege would result in the imposition of a penalty. And the fact that [Mr.] Murphy apparently felt no compunction about adamantly denying the false imprisonment charge on which he had been convicted before admitting to the rape and murder strongly suggests that the 'threat' of revocation did not overwhelm his resistance.").

[65] *See Von Behren*, 822 F.3d at 1150 (holding that a threat of revocation of supervised release based on a Fifth Amendment challenge to a sex offender treatment program like the one at issue here constituted unconstitutional compulsion under *Murphy*); *Antelope*, 395 F.3d at 1138 n.4 (holding that the case before it, involving a probationer who was required to disclose incriminating information in a treatment program as part of his probation, was the "classic penalty situation" discussed in *Murphy*). Although we are not bound to follow precedent from the circuit courts of appeal on questions of federal constitutional law, the reasoning in these cases is persuasive and confirms the correctness of our interpretation of the United States Supreme Court's Fifth Amendment jurisprudence.

not follow this precedent, pointing to a case by the Indiana Supreme Court, *Bleeke v. Lemmon*,[66] that reached a different conclusion.

¶ 39 In *Bleeke*, the Indiana Supreme Court considered whether a threat of revocation of parole could be considered compulsion under the Fifth Amendment.[67] Although the court recognized that under both *Murphy* and its own precedent, the revocation of probation constitutes compulsion,[68] it distinguished these cases based on its conclusion that probation is distinguishable from parole. In the court's view, probation "is a matter of judicial grace and discretion as a deliberate sentencing alternative to be imposed *in lieu of* incarceration" while parole "is a substitution during the continuance of the parole, of a lower grade of punishment, by confinement in the legal custody and under the control of the warden."[69] Thus, the court reasoned that parole is simply a privilege akin to a transfer to a minimum security prison that does not alter the length of the term of incarceration, meaning that revocation of parole has no significant effect on the parolee, and that probation, on the other hand, is a substitution for incarceration, and thus the revocation of probation has the legal effect of altering a defendant's sentence and extending the amount of time an individual is incarcerated.[70] The court therefore concluded that the differences between parole and probation were significant enough to justify distinguishing *Murphy* and holding that the revocation of parole does not constitute compulsion.[71]

¶ 40 The State urges us to make this same distinction and hold that *Murphy*'s reasoning does not extend beyond probation. But the distinction between probation and parole is one without a significant legal difference. The United States Supreme Court has noted that it cannot perceive "any difference relevant to the guarantee of due process between the revocation of parole and the revocation of

[66] 6 N.E.3d 907 (Ind. 2014).

[67] *Id.* at 935–40.

[68] *See id.* at 935–37 (discussing *Murphy* and *Gilfillen v. State*, 582 N.E.2d 821 (Ind. 1991)).

[69] *Id.* at 937–38 (citation omitted).

[70] *See id.* at 937–39.

[71] *Id.* at 939–40.

probation."[72] And Utah courts have likewise treated probation and parole proceedings similarly.[73] Both are a form of supervised release that confers upon the individual a virtually identical conditional liberty interest. Both are provided as an alternative to incarceration, though the timing and procedures for each differ, and the revocation of either probation or parole has the practical effect of increasing the amount of time a defendant must be incarcerated. We do not find the distinction relied upon by the Indiana Supreme Court persuasive. Accordingly, though we agree with the Indiana Supreme Court's interpretation of *Murphy* that the revocation of probation constitutes compulsion, we do not find persuasive its distinction between probation and parole. Thus, we disagree with its conclusion that *Murphy*'s reasoning should not be applied to revocation of parole.

¶ 41 Accordingly, we hold that a threat to revoke a defendant's parole constitutes compulsion for purposes of the Fifth Amendment. And as Mr. Bennett has established an issue of fact as to whether he was actually threatened with revocation if he did not surrender his Fifth Amendment claim and provide incriminating information, the trial court erred in granting summary judgment. We therefore reverse the trial court's grant of summary judgment and remand for further proceedings.

¶ 42 Our opinion today should not be viewed as a rejection of the valid and important rehabilitative purposes of sex offender treatment programs such as the BCCC. It is well established that "sex offenders [often] repeat their past offenses, and informed counseling can only help protect them, their potential victims, and society. The irreconcilable constitutional problem, however, is that even though the disclosures sought here may serve a valid rehabilitative purpose, they also may be starkly incriminating. . . ."[74] Although the State argues that our decision today will undermine the purposes and effectiveness of sex offender treatment programs, a compelling state

---

[72] *Gagnon v. Scarpelli*, 411 U.S. 778, 782, 782 n.3 (1973) ("Despite the undoubted minor differences between probation and parole, the commentators have agreed that revocation of probation where sentence has been imposed previously is constitutionally indistinguishable from the revocation of parole.").

[73] *See, e.g.*, *Baine v. Beckstead*, 347 P.2d 554, 557 (Utah 1959); *State v. Jarman*, 1999 UT App 269, ¶¶ 6–7, 987 P.2d 1284; *State v. Byington*, 936 P.2d 1112, 1115–16, 1116 n.2 (Utah Ct. App. 1997).

[74] *Antelope*, 395 F.3d at 1137–38.

interest does not outweigh an individual's Fifth Amendment rights.[75] The Supreme Court, recognizing this problem, suggested the solution in *Murphy*: "[A] state may validly insist on answers to even incriminating question and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination."[76] Given the circumstances of Mr. Bennett's case—that he has received a life sentence for prior sex crimes—it would seem that the State's need to retain the ability to further prosecute Mr. Bennett is significantly less than its need to ensure that it is both wise and safe to release him on parole. But without immunity, the State cannot require Mr. Bennett to choose between incriminating himself and losing his parole.

## Conclusion

¶ 43 The trial court erred in refusing to consider Mr. Bennett's second request for counsel. It also erred in granting summary judgment because issues of fact remain as to whether Mr. Bennett's Fifth Amendment rights were violated by the requirement that he comply with the BCCC program. There are genuine disputes of material facts as to whether the questions posed to Mr. Bennett bore a risk of incrimination and whether the circumstances in which those questions were posed constituted compulsion. Accordingly, we reverse the decision of the trial court and remand for further proceedings.

––––––––––––

[75] *See id.* at 1134–35 ("[C]ountervailing government interests, such as criminal rehabilitation, do not trump [the Fifth Amendment] right. Thus, when 'questions put to [a] probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution,' he may properly invoke his right to remain silent." (citation omitted)).

[76] *Murphy*, 465 U.S. at 435 n.7.